### MERIAM v. HARSEN et al.(a.)

Certificate of acknowledgment, signed by a master in chancery, upon a deed dated 29th May, 1790, executed by a married woman of her estate showed, on a private examination, that she " acknowledged she executed the same without any fear, threat, or compulsion of her husband."    The statute of 1788 declared, that no estate of a *feme covert* should pass without a previous acknowledgment by her on a private examination, &c., that she executed such deed freely, without any fear or compulsion of her husband.    *Held*, in the absence of proof of fear, threat, or compulsion, that there was a substantial compliance with the statute, and that the certificate was to be presumed sufficient.

Although a bill in partition states that certain property belongs to husband and wife, and the decree follows the bill, yet, as an accounting was connected with the suit which justified the making of both of them parties, it was not to be considered that these statements created an estoppel as to the

(a) Affirmed on appeal, 6th April, 1847.

real rights of these parties, and that the husband alone might, notwithstanding, be seized of a fee.

A wife may, without the intervention of a court, convey away her estate to a stranger or to her husband by circuity; but chancery will scrutinize the act closely, to see that she has not been circumvented, coerced, defrauded, or unduly influenced.

On the 28th May, 1790, husband and wife, for a nominal consideration, conveyed the estate of the wife to G. F., who, by deed dated the next day, also for a nominal consideration, conveyed the property to the husband in fee. Deed recorded. Afterwards the husband alone made long leases, still living in harmony with his wife, and she, with others, executed certain articles dated in Feb. 1809, in which there was a recital and declaration recognizing the fee in the husband; there was nothing to show but the act was a free will offering by the wife; the transaction had been suffered to stand for about forty-five years unquestioned and undisturbed; and both husband and wife were dead: *Held*, a valid deed.

1842.

MERIAM
*v.*
HARSEN.

*April* 28
29;
*May* 3, 4,
1842.

*Deed.*
*Acknow-*
*ledgment.*
*Statute.*
*Estoppel.*
*Husband*
*and wife.*

PRIOR to the twenty-eighth day of May, one thousand seven hundred and ninety, Mrs. Catharine Harsen, the wife of Jacob Harsen, was seized in fee of certain real estate.

The bill in this suit was filed to set aside a deed of it made the twenty-eighth day of May in the said year one thousand seven hundred and ninety, (for the consideration of five shillings,) by the said Jacob and Catharine Harsen to Gabriel Furman and, in that way, also, destroy a deed dated the day after (the twenty-ninth day of May, 1790,) whereby the said Gabriel Furman, in consideration of ten shillings, reconveyed to the husband only, Jacob Harsen, the said property in fee. The principal grounds taken against the first mentioned deed from the said Jacob Harsen and Catharine his wife, were, that she, Catharine, had not properly acknowledged it under the then statute; and, that her genuine signature was not to it; or, if to it, that some fraudulent means had been used to obtain it. There was likewise a seeming attempt to affect the will of Jacob Harsen.

It was also made a strong point in the suit that Mrs. Catharine Harsen could not, by the above means, during coverture and for a mere nominal or no consideration, thus make, in effect, a gift of her estate to her husband.

The certificate of acknowledgment upon the deed of the twenty-eighth day of May, one thousand seven hundred and ninety, (executed by Catharine Harsen and her husband,) was in these words: " Be it remembered, that on the twenty-ninth day of May, in the year of our Lord one thou-

sand seven hundred and ninety, before me, John Ray, one of the masters in chancery for the State of New York, personally appeared Jacob Harsen and Catharine his wife; and the said Jacob Harsen acknowledged he sealed and delivered the within written indenture as his voluntary act and deed for the uses and purposes within mentioned; and the said Catharine, being examined by me privately and apart from her husband, acknowledged she executed the same without any fear, threat or compulsion of her husband·; and I having perused the said indenture and finding therein no material errors or interlineations (except the words 'feet six' on the fifty-eighth line, same page interlined) do allow the same to be recorded."

"JOHN RAY."

This deed was recorded the twenty-fourth day of May, one thousand seven hundred and ninety. Catharine Harsen died on the eighth day of May, in the year one thousand eight hundred and thirty-five; and her husband Jacob Harsen departed this life on the twenty-fourty day of July, in the same year.

The bill insisted that the said Catharine Harsen never acknowledged she executed the said deed *freely*, as was required by the then law of the state.

A partition suit, in which the said Jacob Harsen and Catharine his wife were parties, was attempted to be made to bear upon the present proceedings, so far as to raise a presumption of understood ownership in Mrs. Harsen, after the date of the said deed to Gabriel Furman; and certain articles of agreement, having reference to the partition property, was used to negative the presumption of her after ownership. All this sufficiently appears in the opinion of the court.

A mass of testimony was taken in the suit, but, as the only two interesting points were, as to the sufficiency of the acknowledgment under the then statute, and how far the wife, Catharine, could thus pass over her estate to her husband, it is deemed unnecessary here to do more than merely (with the above explanation) give the opinion of the court.

Mr. *W. S. Johnson*, for the complainant.

Mr. *George Wood*, for the defendants whose interests were identified with those of the complainant.

Mr. *J. W. Gerard*, for the defendant Jacob Harsen.

THE VICE-CHANCELLOR.—The first question to be considered is, as to the sufficiency of the acknowledgment by Catherine Harsen, the wife, of the deed of conveyance from herself and husband to Gabriel Furman, of the twenty-eighth day of May, one thousand seven hundred and ninety, to pass her estate?

The statute of one thousand seven hundred and eighty-eight, then in force, (2 Greenl. 99,) declares, that no estate of a *feme covert* shall thenceforth pass by her deed, without a previous acknowledgment by her, on a private examination apart from her husband, that she executed such deed *freely*, without any fear or compulsion of her husband, endorsed on the deed conveying the same, and signed by the person before whom such acknowledgment shall be made.

The certificate of John Ray, a master in chancery, endorsed on this deed, states, that, on the twenty-ninth day of May, one thousand seven hundred and ninety, the parties personally appeared before him, Jacob Harsen, (the husband,) acknowledged that he sealed and delivered the instrument as his voluntary act and deed for the uses and purposes therein mentioned, and the said Catherine (the wife) being examined by him privately apart from her husband, acknowledged she executed the same without any fear, threat or compulsion of her husband; and that he (the master) having perused the deed, and finding therein no material erasures or interlineations (except one noted) did allow the same to be recorded; and the deed was accordingly put on record in the month of August following.

The omission of the word "freely" in the master's certificate of acknowledgment presents the only objection to it. Every thing else is there that the then statute required.

VOL. IV.—10

1842.

MERIAM
*v.*
HARSEN.

*April* 17, 1843.

The private examination of the wife—her confession that she executed the deed without any fear or compulsion of her husband, and, moreover, without a threat of any sort from him—and all this endorsed on the deed and signed by the master, appears. But it does not appear that she was asked whether she executed the deed "freely;" or if she was, and so acknowledged, the master has omitted to certify it in terms. Is this omission material? In the absence of fear, threat or compulsion, must it not be implied that it was a free and voluntary act within the meaning of the statute?

The statute prescribed what the certificate should purport—not the form of it, nor the exact words it should contain; and an act done without fear, threat or compulsion seems to carry with it freedom from restraint, coercion or undue influence. How far a married woman may be influenced by motives of generosity or affection towards her husband, or by a desire to promote his interests in parting with or incumbering her real estate for his benefit, is not the question under this provision in our statutes. Such motives and inducements may exist, and probably tend to actuate married women in a great majority of instances where they consent to dispose of or incumber their estates, or are called upon to join with their husbands in executing conveyances; but, so long as it is the policy of the law to allow them to do so at all, the law must admit such motives or inducements to prevail to a considerable extent. I can hardly think it was or is the object of the statute to guard women against the influence of such generous motives, because they are not thereby necessarily disqualified as free agents from exercising the power of refusal, when they are not perfectly satisfied that it will be for their own or their husband's interest to dispose of their property by deed. The word freely, therefore, as used in the statute, must have reference to something else than this natural or habitual influence which a husband may be permitted to acquire over his wife, and against which she stands in need of no protection. It must have reference to that which amounts to restraint upon a wife's actions—to coercion by undue means—to over persuasion, or some im-

proper influence brought to bear upon her mind, which leaves her no longer the freedom to act as she may think proper; and the absence of all such improper means may well enough be inferred when a wife, removed from the immediate presence of her husband, and having an opportunity to express a dissent, or having a reluctance to join in the deed, is, not only silent, but acknowledges she is laboring under no fear, nor influenced by any threat or compulsion.

Our courts have not been strict in requiring a very close adherence to the words of the statute in certificates of acknowledgment of deeds and mortgages, lest it might involve much litigation and tend to disturb or unsettle many titles. They have been disposed to take some things for granted which did not appear, and to allow what seemed to have grown into a usage or settled practice of judges and other officers authorized to perform this duty to have great weight in giving effect to and fixing the construction of the statute; and where there has been a substantial compliance with its form, it has been held sufficient: *Troup* v. *Haight*, Hopk. R. 239; *Jackson* v. *Gumaer*, 2 Cowen, 552; *Thurman* v. *Camerra*, 24 Wend. 87.

There are a great number of deeds on record where the word "freely" is omitted in the certificate of acknowledgment. Some hundred of instances are produced in evidence in this cause, to show the practical construction which has been given to the statutes, in former times, by judges of eminence in their day, and men of great experience and of correct business habits, who were then entrusted with the performance of this duty. Besides, it is a fair presumption that those who have been appointed to guard the rights of married women against the improper conduct of their husbands, when they come to acknowledge deeds, and which acknowledgments are essential to the validity and effect of the instruments, have performed that duty honestly and correctly, by requiring such an acknowledgment as the statute requires, although in the certificate endorsed a word may be wanting. In *Jackson* v. *Gilchrist*, 15 Johns. R. 89. Mr. Justice Thompson, in delivering an opinion, held, that the court would presume, after a considerable lapse of time, that the officer taking an acknowledgment of

a *feme covert*, had privately examined her apart from her husband, because it was his duty to have done so, although his certificate did not state the fact.

Again, as to the sufficiency of the certificate, and the manner of the acknowledgment, it is purely a question of law. That question upon the deed now in controversy has been presented to and been passed upon by a court of law of competent jurisdiction and authority to determine it. In an action of ejectment brought in the superior court against the complainant in this cause, by some one or more of these defendants, in which the plaintiffs therein claimed title under this very deed, an objection was taken to it on the ground of the insufficiency of the acknowledgment by Catherine Harsen, the wife, to pass her title; and upon a case reserved, the point was argued and considered by that court, and the objection over-ruled, and judgment was rendered in favor of the title derived from this deed. This judgment of a court of law upon the point, standing unreversed, and for any thing that appears to the contrary acquisced in, has the force of authority which is binding upon the parties, and which the court of chancery could hardly feel itself at liberty to dissent from. I think the question must be considered as put at rest; and that the manner and form of the acknowledgment of the deed, as certified by John Ray, the master, was sufficient, so far as the ceremonial is concerned, to pass the title and estate of the wife.

The next objection taken by the bill to the deed in question, is, that it is a forgery, or if not actually forged, that the wife's signature and her apparent consent to it, have been obtained by some fraudulent means. There is not the least ground on which to raise the slightest suspicion that the instrument is a forgery; and with regard to the manner of obtaining it, not a particle of evidence is produced to support such an allegation. On the contrary, the circumstances which must have attended the transaction, all go to prove that fraud or concealment of the object and purpose of the deed could hardly have been practiced upon the wife, unless, indeed, we are prepared to believe, without proof and contrary to all probability, that two respectable citizens, who became the subscribing witnesses, the master in chancery,

who took the acknowledgment and who certified that he had perused the instrument and Gabriel Furman, (the grantee,) and his wife, also, who joined with him in an immediate reconveyance, all entered into a base conspiracy with Jacob Harsen, to cheat his wife. The character of the parties forbid such a supposition. Mrs. Harsen was, moreover, a woman, possessing, at least, ordinary, if not more than ordinary intelligence and understanding. She was a woman, too, of some education, for she wrote her name in full to the deed; and from the character which is given of her by the witnesses, she had a very considerable knowledge of business in relation to property. She was not, therefore, a woman likely to be imposed upon or very liable to be drawn in to execute any deed, the object and purport of which she did not fully comprehend. The simultaneous execution of the conveyance and reconveyance, as is evident from an inspection of the two instruments, must have brought Harsen and his wife and Furman and his wife together by previous appointment; and it is impossible to suppose that people of their habits and character could have met, upon so unusual a business, without conversing on the subject of their meeting and knowing what they were going to do. Under such circumstances, there could have been no mystery or concealment of each other's purposes—all must have understood it, although, at this distance of time, Mr. Furman's memory fails him as to anything that was said or done on the occasion.

But, it is contended, that the deeds never took effect so as to pass the title—were never delivered—remained in escrow, or as mere dead letter instruments, and were never acted upon during the joint lives of Harsen and his wife, or if of any effect to vest the title in the husband beyond his mere marital right that he held it as naked trustee of the wife and that this court is bound so to regard him. Various facts and circumstances are adduced in evidence upon which this view of the case is attempted to be supported; such, for instance, as the wife's management to some extent of the property, as if it had been still her own—superintending the garden and the marketing of its produce and taking the proceeds to her own use—talking of the houses

in Mott-street, while they were being built, as if she were building them out of her separate means; and frequently pointing out which of her grand-children she intended should have particular houses and other pieces of property.

Declarations and acts like these cannot, however, be allowed to have the effect of annulling the deed or of raising a trust under it in favor of the wife. Living all the time in perfect amity with her husband, it was natural for her to speak and act as though she still had an interest and ownership in the property, for she could not but feel, under such circumstances, that whatever belonged to her husband belonged to her. All this is, therefore, easily reconcilable with the fact that the legal title and estate was, nevertheless, exclusively in him.

But the testimony from which such inferences, in favor of the idea that she had not intentionally relinquished all title to the property is drawn, is more than counterbalanced by the facts which appear on the other side. Numerous leases are produced which Jacob Harsen granted in his name alone, for absolute terms of years, that might have extended beyond his estate by the curtesy, and having no reference to his own life individually or the joint lives of himself and wife; showing very clearly. that they were based upon the title which he had previously acquired from his wife, being for parcels of the property conveyed by the deeds in question.

There is another piece of evidence, however, which is calculated to show that Jacob Harsen himself considered he held the property in right of his wife, notwithstanding the deeds. I refer to the proceedings and decree in the partition suit commenced by the filing of a bill in chancery in the year one thousand seven hundred and ninety-four, in which Jacob Harsen and his wife were co-complainants with others. This bill does, indeed, state that Harsen and wife were seized in right of the wife; and the decree made in the cause in the year one thousand eight hundred and eight follows the bill in that respect and adjudges that share of the estate to be thus held;—neither the bill nor the decree making any mention of the conveyance through Furman to the husband.

As to the effect which this proceeding is to have on the rights of the husband, (for it is contended that, by the decree, he is estopped from denying that, at that time, he held the property in right of his wife,) it may be observed that the bill was filed without the oath or even the signature of any person, except the solicitor and counsel whose names are subscribed to it. The bill is to be regarded, therefore, as a mere pleading, and, in framing it, the solicitor probably deemed it unnecessary, for the purposes of a partition and settlement among the Cozine family, of which Mrs. Harsen was one, to set out the conveyances by which her husband had become seized in his own right, or to state the change which had taken place in that particular, because it was a matter not affecting the rights of the other tenants in common. Even if it had been stated, it would not have dispensed with the necessity of making Mrs. Harsen a party to the suit in conjunction with her husband. A partition of the real estate was not the sole object of the bill ; an additional object was, the settlement of accounts between all the parties in relation to the rents and profits of different parcels of the estate which they had severally possessed and enjoyed for a long series of years, and, especially, to call the widow and heirs of Balm Johnson Cozine to an account in relation to the possession of a deceased brother's share which he had entered upon and held ; and more especially still, to establish a claim in favor of Jacob Harsen and his wife, as representing her deceased father, Garrett Cozine, for money which they had been compelled to pay in the year one thousand seven hundred and eighty-six in discharge of a debt originally of Balm Johnson Cozine and his deceased brother Cornelius, for which his brother had become surety and which it was claimed the widow and children of Balm Johnson Cozine, by virtue of the property descending or coming to them, were bound to pay or contribute to the payment of.

This showed the necessity or propriety, at least, of making Mrs. Harsen a party to the suit conjointly with her husband ; and being a necessary party, it is easy to see how counsel may have advised and probably did advise that no notice should be taken of the change in the title of her share of

the real estate in drawing the bill, and that their rights should be stated as they originally existed for the sake of simplifying the proceedings as much as possible; leaving the decree to enure to the husband's benefit according to the deeds between them. The decree was made to follow the bill in that respect, declaring the husband and wife to be seised of one-fourth of the estate in right of the wife; but, from what subsequently took place, it is very evident that this declaration in the decree was regarded as mere matter of form as between the husband and wife. The decree was but interlocutory in its nature; and it appears to have been abandoned shortly after it was made, by an agreement for a compromise and settlement entered into by all the parties. Articles of agreement were drawn up and executed under their hands and seals on the ninth day of February, one thousand eight hundred and nine. This instrument recites the pendency of the chancery suit; and states that, so far as the property on Broadway and Fair-street was concerned, the matter was compromised in such manner that, by the mutual consent of the parties, one undivided fourth part thereof was admitted and agreed to belong to Jacob Harsen, one other undivided fourth part thereof to Lettice, the wife of Peter Hegeman, and so on with other fourth parts. It then provides that the property should be sold at auction and the net proceeds divided in the following manner: one equal fourth part should be deemed to belong and be paid over to Jacob Harsen; one other fourth part to Peter Hegeman and Lettice his wife, in right of the said Lettice; and so with other shares held by married women, the money was to be paid over to their husbands in right of the wives. Not so, however, with Mrs. Harsen. Her husband was declared to be the owner of the share which had belonged to her, and the money was to be paid to him, not in her right, but in his own without any qualification. Mrs. Harsen was a party to this instrument; she is named in it and she executed it under hand and seal, and, what is more, acknowledged the execution on the day of its date before an officer authorized to take the acknowledgment of deeds, as did all the other parties to the instru-

ment, and in a manner to pass real estate of married women as well as other persons.

The next is a deed of mutual release and quit claim of the same date (the ninth day of February, one thousand eight hundred and nine,) in which Mrs. Harsen unites with her husband,. and whereby all the parties to the chancery suit released each other from all personal claims and demands; and this is followed by another deed of the same date, and simultaneously executed and acknowledged, by which all the other parties interested in the Cozine estate quit claim to Jacob Harsen solely, in his own right and not in that of his wife, certain parcels of Bloomingdale property which had long previously been set apart to his wife in the division of the estate and which are conveyed by the Furman deeds. To this last instrument Mrs. Harsen was not a party, but it is a fair inference that she was present when it was executed and assented to its being made to her husband alone.

These things show that, when the parties came to act for themselves in so important a matter as that of executing solemn instruments under seal which were to put at rest all questions in, relation to their respective ownerships and personal liabilities, the legal rights of Jacob Harsen, as acquired by the Furman deeds, were not lost sight of, however differently those rights may have been treated in the chancery proceedings. These instruments were drawn in strict accordance with the title which, in fact, he held; and it must be presumed they were so drawn with full understanding and acquiescence of his wife.

I am now brought to consider another view of this case as presented and contended for by the senior counsel who argued for the complainant, viz. that there has been a gift of the wife's entire estate to her husband without consideration—or but a nominal one—during coverture; that it was an improvident disposition of the wife's property, to say the least of it; and inasmuch as it is the policy and duty of this court to protect persons against the consequences of their acts done in favor of others standing in a confidential relationship towards them, the transaction in question cannot stand in the broad sunshine of a court of equity.

Vol. IV.—11

There is, certainly, no positive prohibition in law or in doctrine or principles of this court to prevent a married woman from parting with her property even by way of gift to her husband. Where she has property, either real or personal, settled to her separate use or secured as her separate estate, she may part with or relinquish it in favor of her husband or dispose of it as she pleases to other persons, unless restrained by some express clause in the deed or will from so doing: *Pawlet* v. *Delaval*, 2 Vesey Senr. 663, before Lord Hardwicke ; *Pybus* v. *Smith*, 3 Bro. C. C. 340, and *S. C.* 1 Vesey, Jr. 189, before Lord Thurlow ; *Rich* v. *Cockel*, 9 Vesey, 369 ; and *Parker* v. *White*, 11 Vesey, 222, before Lord Eldon, are all cases in which it is admitted that gifts by the wife to the husband of her separate estate may be made, in the absence, of course, of fraud, coercion or undue influence, and that the natural influence resulting from the marriage which every husband may be supposed to have acquired is not a sufficient ground for invalidating them.

It is true that, in some cases, where a married woman is proceeding to part with a separate property or to relinquish separate interests which are held subject to the supervisory power of this court, she may be required to give her consent upon a personal examination in court or before one of its officers ; although it would seem that such an examination is not always deemed indispensable : See Sir Wm. Grant, M. R., in *Sturges* v. *Corp*, 13 Vesey, 190. If, then, in cases of a separate estate or where she has equitable property it is competent for her to part with it by way of gift to her husband, where she is not prevented by a clause against anticipation, why may she not relinquish or give up to her husband property of which the legal title and estate is held in her right ?

Property thus held is, surely, not considered more sacred or regarded with higher favor by a court of equity in respect to the rights and interest of a *feme covert*, than property which has been bestowed upon her expressly for her separate and exclusive use and with direct reference, perhaps, to the protection which such a court can afford to it. No—she is just as competent to part with the one as with

the other. There can be no difference in principle or in reason with respect to her power and right to do so. The form and manner of doing it may be different. She can make no valid conveyance or transfer of property during the coverture of which the legal title was or is in her, except by the joint deed of herself and her husband. His assent and concurrence is necessary, because of the joint seisin which he acquires by the marriage. In order to part with her title to property thus held, no previous act or permission of this court is requisite. Her consent is not to be obtained on a private or personal examination in chancery. There is no case in which it ever has or can be required when a married woman is about to dispose of her real estate not settled to her separate use. The statute law of the state has provided another and effectual mode of doing it:—she and her husband have only to unite in executing and acknowledging a deed before a commissioner or other officer, in the manner prescribed by the statute; and, whether such deed be made to a stranger or to the husband by circuity, she is equally competent to make it. The case of *Jackson* v. *Stevens*, 16 Johns. R. 110, is in point to show that a good title may pass and vest in the husband, of a wife's land, by just such a circuity of conveyance as was adopted in this instance. All that the court of chancery can do, in such cases, is, to view the transaction with an eye of suspicion and jealousy and scrutinize it closely. If it finds that the wife has been circumvented, coerced, defrauded or unduly influenced into the measure, it can, then, interfere, but not otherwise. I have sought in vain for facts or circumstances to justify such an interference in this case. Nothing appears to my mind by which I can view the transaction in any other light than as a pure free will offering by the wife to the husband, and it is due to the good name which these people both deservedly enjoyed during a long life, and which they left behind them as part of the inheritance to their grand-children, (between whom this controversy has arisen,) to believe that it proceeded from just and generous motives on her part, and not from unworthy and selfish ones on the part of her husband.

The transaction has been suffered to stand for a period

1842.

MERIAM
v.
HARSEN.

of about forty-five years unquestioned and undisturbed; not even the expression of a regret or of a wish to the contrary from either of the parties has been heard; and, in my judgment, it would be almost like sacrilege now to disturb it.

The bill in this cause has, likewise, attempted to impugn the will of Jacob Harsen; but, upon the hearing, not a question or a point has been made against its validity.

Every ground, therefore, upon which the bill was filed, appears to have failed the complainant; and it must, consequently, be dismissed, with costs.